IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| OHIO LEARNING CENTERS, LLC, *ET AL.* | * | |
| PLAINTIFFS, | * | |
| | * | CIVIL ACTION NO.: RDB-10-1932 |
| V. | * | |
| SYLVAN LEARNING, INC., *ET AL.* | * | |
| DEFENDANTS. | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## <u>MEMORANDUM OPINION</u>

Plaintiffs Ohio Learning Centers, LLC ("OLC") and Janet Tomaskovich ("Tomaskovich") (collectively "Plaintiffs") originally filed this action in the Cuyahoga County Court of Common Pleas in Cuyahoga County, Ohio on April 16, 2010.  After removal, on the basis of diversity of citizenship, to the United States District Court for the Northern District of Ohio, the Defendants Sylvan Learning, Inc. ("SLI") and Sylvan Learning Centers, LLC ("SLC") (collectively "Defendants") moved to dismiss the case, or alternatively to transfer the case to this Court pursuant to a forum-selection clause contained in the underlying contract at issue in this case.  On July 14, 2010 the Northern District of Ohio granted the Defendants motion and transferred the action to this Court.  Broadly, Plaintiffs allege that the Defendants fraudulently induced them to purchase, finance, and run a Sylvan Learning Center franchise located in Westlake, Ohio.  More specifically, Plaintiffs argue that Sylvan breached the franchise contract, breached warranties, committed fraud, made various misrepresentations, allowed territorial infringement, committed tortious

interference in business relationships, and violated numerous Ohio and Maryland statutes governing contracts and franchise relationships.

In response, Defendants have filed counterclaims against the Plaintiffs for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114 & 1125, breach of a covenant not to compete, and breach of contract. Essentially, the Defendants contend that Tomaskovich is a sophisticated businesswoman who, after failing to make profitable the Westlake, Ohio Learning Center, suffered buyer's remorse and unilaterally ceased making payments under the parties' contracts while continually using the Defendants' trademarks and continuing to reap the benefits of operating under the "Sylvan" moniker.

Among the pending motions in this case is the Defendants' Motion for Summary Judgment on their Amended Counterclaims. This Court has reviewed the record, as well as the pleadings and exhibits, and conducted hearings on February 2, 2011, February 14, 2011, and March 8, 2012 pursuant to Local Rule 105.6 (D. Md. 2011).[1] For the reasons that follow, the Defendant's Motion for Summary Judgment on Amended Counterclaims (ECF No. 71) is GRANTED IN PART and DENIED IN PART. Specifically, it is granted with respect to Counts I through IV and denied with respect to Count V.

---

[1] The February 2011 hearings did not specifically pertain to the pending motion for summary judgment as that motion was not filed until later in these proceedings. However, prior to moving for summary judgment, the Defendants moved for a temporary restraining order and preliminary injunction on the grounds contained in their counterclaims, which this Court granted subsequent to the February, 2011 hearings. *See* Orders, ECF Nos. 57 & 63. Furthermore, during the hearing conducted on March 8, 2012 argument was heard on all the pending motions in this case, of which there are many. This Court will, by separate Memorandum Opinion, rule on those other pending motions.

BACKGROUND

The factual background described herein is comprised primarily of undisputed facts. Where disputed facts exist, however, those facts are construed in the light most favorable to the nonmoving party—here, the Plaintiffs. *See Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (U.S. 2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391-92 (4th Cir. 2009).

Defendants are in the business of providing personalized learning programs for students throughout the United States. In this regard, they have developed proprietary programs, materials, diagnostic tests, and other related education systems designed to be utilized, administered and taught by trained Sylvan personnel. Defendants have numerous trademarks in connection with their proprietary education system.

In early 2007, Plaintiff Janet Tomaskovich, the principal and sole member of Ohio Learning Centers, LLC, was hired by Sylvan Learning, Inc. to be the temporary director for a Sylvan Learning Center in Westlake, Ohio. At that time, this center, known as the Westlake Learning Center, was owned by Sylvan Corporate—in other words, it was not a franchise. Shortly after assuming the temporary director position at the Westlake Learning Center, Defendants expressed interest in selling, and Tomaskovich expressed interest in buying the Westlake Learning Center as a franchise.

According to the Plaintiffs, the Westlake Learning Center was underperforming and the Defendants' parent company, Educate, Inc., was under pressure to "reduce its debt, raise cash, and complete [a] merger." Pls.' Am. Compl. ¶ 18. In this regard, Plaintiffs allege that Educate, Inc. and the Sylvan Defendants sold or attempted to sell all corporate owned Sylvan Learning Centers. *Id.* ¶¶ 19-22. The Plaintiffs claim that only two weeks into

Tomaskovich's employment at the Westlake Learning Center, the Defendants began negotiations with Tomaskovich regarding the sale of the Center as a franchise.  *Id.* ¶ 30. Indeed, Plaintiffs contend that Defendants pursued a "hard sell" strategy, and encouraged Tomaskovich to "act fast." *Id.*

Notwithstanding this alleged "hard sell" strategy, Tomaskovich was willing to negotiate, and as early as April 4, 2007, sent a letter to Greg Helwig, a Vice President at Sylvan Learning, Inc. ("SLI") in which she made an offer of $150,000 to purchase the Westlake Learning Center. *See* Apr. 4 Helwig Ltr., ECF No. 71-4.   In that letter, Tomaskovich acknowledged that the Westlake Center was the "poorest performing" center in Northeast Ohio, but maintained that "I am the most familiar with this Center and believe I can make a success of this Center as its franchise owner." *Id.*  Regarding the performance and her proposed operation of the Westlake Center, Tomaskovich "justifi[ed]" her offer on the grounds that that the Center's "revenues are significantly under budget," its lease expense "is significantly higher than other [Centers]," "[c]osts, such as labor, are substantially higher in relationship to revenues," and that if Tomascovich were to open a new Center, she "would have more control of major commitments like lease costs." *Id.*   Finally, Tomaskovich noted that "better Centers are available," and indicated that SLI was to contact her "financial advisor" for further negotiations. *Id.*

Negotiations were ongoing, and on July 26, 2007, Ohio Learning Centers, LLC entered into an Asset Purchase Agreement with Sylvan Learning Centers, LLC whereby OLC purchased assets used in the operation of the Westlake Learning Center. *See* Defs.' Am. Countercl. ¶ 7.  The asset purchase price was $142,000, of which $138,000 was to be

paid via two Promissory Notes payable to SLC and guaranteed by Tomaskovich.  *See id.* ¶¶ 8-9.

On the same day, OLC and Sylvan Learning, Inc. entered into a License Agreement whereby SLI granted OLC a license to operate the Westlake Center as a Sylvan franchise.  *Id.* ¶ 13.  Under the License Agreement, the licensing fee was $48,000, *id.* ¶ 14, which resulted in OLC and Tomaskovich owing $190,000 to complete the transaction.  Of the $190,000 total due at closing, Tomaskovich paid $30,000 in cash and executed two Promissory Notes for the remaining $160,000.[2]  Tomaskovich personally guaranteed OLC's obligations to SLI.  *See* License Agmt., ECF No. 71-6.

The License Agreement granted OLC and Tomaskovich authorization to operate a Sylvan franchise using federally registered Sylvan trademarks, and also granted to Plaintiffs an exclusive territory in which to operate the Westlake Learning Center.  *See* Defs.' Mot. Summ. J. at 8; *see also* License Agmt.  The License Agreement also contains a non-compete clause providing that, in the event the License Agreement is terminated, the Plaintiffs are prohibited from operating a competing learning center for two years and within five miles of the Westlake Center.  License Agmt. ¶ 11.5.2.  Defendants claim to have spent "large sums of money" advertising and promoting the Sylvan marks as well as on developing educational programs throughout the United States.  Defs.' Am. Countercl. ¶ 18.  As a result, Defendants maintain that the Sylvan Marks "have become associated in the minds of the consumer public with the provision of, among other things, high quality and effective

---

[2]  The Promissory Notes were amended in June of 2008 to amend the Notes' amortization tables, payment schedules, and payment commencement dates.  The other provisions of the Promissory Notes remained the same.  *See* Pls.' Am. Compl. ¶ 90; Defs.' Am. Countercl. ¶¶ 31-34.

personalized learning programs for students through the use of the Sylvan System." *Id.*; *see also* Feb. 2, 2011 Hrg. Tr. at 21-22.

After executing the Asset Purchase Agreement, Promissory Notes, and License Agreement, Plaintiffs began operating the Westlake Learning Center as a Sylvan franchise with the attendant Sylvan Marks and operational materials. Shortly thereafter, however, it became apparent that the operational expenses of running the Center exceeded revenue, and while the Plaintiffs were able to make advertising and royalty payments, they were unable make payments on the Promissory Notes. Even though under the amendments to the Promissory Notes, *see supra* note 2, payments on the Notes were deferred until March and April of 2009, Pls.' Am. Compl. ¶ 90, Plaintiffs ceased making the required payments on the Notes as early as June 2009.[3]

On March 25, 2010, Defendants sent Plaintiffs two Notices of Default and Intent to Terminate License Agreement. *See* Default Notices, ECF No. 71-10. In those notices, the Defendants indicated that due to the failure to make installment payments on the Promissory Notes, the Plaintiffs were in breach of the Licensing Agreement. *See id.* Furthermore, the notices advised the Plaintiffs that should they fail to pay the entire balance—totaling some $46,268.45—then the Defendants would have the right to terminate the License Agreement effective April 17, 2010. *See id.*

---

[3]   There is some evidence that the Plaintiffs did not completely cease making payments on the Promissory Notes at this time. Rather, Tomaskovich claims that she sent "some token amounts on my own." Tomaskovich Dep. Tr. at 180, ECF No. 112-1. However, it is abundantly clear Tomaskovich's unilateral payment reduction scheme was never accepted by the Defendants—indeed Tomaskovich never presented a revised program to the Defendants. *See id.* at 181-82.

The Plaintiffs did not cure their default, and instead filed a lawsuit in the Cuyahoga County Court of Common Pleas in Cuyahoga County Ohio on April 16, 2010, one day before Defendants indicated they had the right to terminate the License Agreement. At the March 8, 2012 hearing in this matter, Plaintiffs' current Counsel represented that Tomaskovich and her former attorney may have set up an escrow account to hold payments normally due to Defendants during the pendency of the litigation between the parties. Defendants disputed this representation, and as a result, this Court ordered that Plaintiffs' current counsel file an affidavit clarifying whether or not any escrow account was ever created and whether any payments were made to such an account. In response, Plaintiffs filed a "Statement Letter of Janet Tomaskovich Regarding Henry Novak." Tomaskovich Letter, ECF No. 136-1. Although this Court specifically requested a yes or no answer regarding whether an escrow account had been established, Tomaskovich only states that, in discussions with her former attorney, she raised "'possibility' of developing an escrow account to hold certain sums that would have been normally paid to Sylvan." *Id.* Notwithstanding the equivocal nature of this statement, it is abundantly clear that no such escrow account was ever created and no royalty, advertising, or Promissory Note payments have been held in escrow.

At that time, Tomaskovich maintains that she was also advised by her former attorney to cease making her scheduled royalty and advertisement payments in addition to the payments due under the Promissory Notes. *See* Tomaskovich Ltr., ECF No. 136-1. She further alleges that her former attorney also advised her that even though she had not made

payments pursuant to the Promissory Notes, she would be able to operate the Westlake Learning Center under the Sylvan moniker.  *See id.*

As previously mentioned, Plaintiffs' case was thereafter removed to the United States District Court for the Northern District of Ohio on May 11, 2010.  That court, in ruling on the Defendants' motion to dismiss or alternatively for transfer of venue, subsequently transferred the case to this Court on July 14, 2010.  *See Ohio Learning Ctrs. LLC v. Sylvan Learning, Inc.*, No. 1:10-cv-1062, 2010 WL 2803042 (N.D. Oh. July 14, 2010).  Plaintiffs claim that their former counsel, Henry Novak, did not apprise them of the transfer, and was generally derelict in his duty in prosecuting this case.[4]  *See* Tomaskovich Ltr.  Mr. Novak has since been disbarred, and Tomaskovich has filed a malpractice lawsuit against him.  *See id.*

From the time that the Plaintiffs instituted this action, through the present, Plaintiffs have still failed to make any payments due under the Promissory Notes.  Defendants did not terminate the License Agreement on April 17, 2010, but sent the Plaintiffs a Notice of Termination on December 13, 2010.  *See* Termination Ltr., ECF No. 71-11.  In that letter, Defendants notified the Plaintiffs that unless they cured all defaults under the Promissory Notes, the Notice of Termination would become effective on December 28, 2010, and the License Agreement would automatically terminate on that date.  *Id.*  The Plaintiffs were

---

[4]  During the course of this litigation, Plaintiffs have been represented by three separate attorneys. As previously mentioned, the first, Mr. Henry Novak, has been disbarred and Plaintiffs have instituted a malpractice action against him. The second, Mr. Seann Malloy, represented the Plaintiffs from approximately January 21, 2011 through July 12, 2011. Mr. Malloy represented the Plaintiffs at the February 2 and February 14, 2011 hearings on the Defendants' motions for temporary restraining order and preliminary injunction. The third, Ms. Michelle Daley, entered here appearance in this case on July 13, 2011, and continues to represent the Plaintiffs.

further advised that if the License Agreement were terminated, the Plaintiffs were to cease "all operations and all use of Sylvan's marks, materials, systems, and know-how." *Id.*

The Plaintiffs made no payments, and the License Agreement was terminated on December 28, 2010. On January 13, 2011, Tomaskovich sent an e-mail to Defendants and advised that because she had been out of town, she had not received the Notice of Termination, and only became aware of the termination on the day she sent the e-mail. Tomaskovich e-mail, ECF No. 130-4. In her e-mail, Tomaksovich specifically stated that she "will cease operating [the Westlake Learning Center] at close of business today, January 13, 2011." *Id.*

On January 26, 2011, the Defendants filed Amended Counterclaims in which they assert five causes of action: federal trademark infringement; unfair competition; breach of a covenant not to compete; breach of contract; and also seek attorney's fees pursuant to fee-shifting provisions in the various contracts executed between the parties. Defs.' Am. Countercl. ¶¶ 51-96, ECF No. 35-3. That same day, the Defendants filed a motion for temporary restraining order on the ground that Plaintiffs continued to operate the Westlake Learning Center under the Sylvan moniker even though the License Agreement had been terminated. On February 2, 2011, this Court held a hearing on the Defendants' motion, and granted the request for a temporary restraining order. *See* TRO Order, ECF No. 44.

During the February 2, 2011 hearing, counsel for the Plaintiffs admitted that Tomaskovich was still operating the Westlake Learning Center well after Tomaskovich told the Defendants that she would cease operating the Center. *See* Feb. 2 Hrg. Tr. at 91 ("my client's [sic] operating a business with, I think, between 10 and 20 employees. . . . If this . . .

[Temporary Restraining Order] is granted . . . my client's business is forced to shut down."). On the basis of this admission and other testimony[5] elicited at the February 2 hearing, this Court granted the Defendants' request for a temporary restraining order.  *See* TRO Order, ECF No. 44.  In noting that the Defendants had established a likelihood of success on the merits regarding their Amended Counterclaims, this Court specifically ordered that the Plaintiffs "shall not use any or all of the trademarks, service marks, or trade names associated with Defendant SLI for any purpose."  *Id.*  Furthermore, this Court ordered the Plaintiffs to "remove immediately and until further ruling by this Court all signs, designs and insignia in any way indicating or suggesting that Plaintiffs' business establishment is related to or connected with SLI, its subsidiaries or affiliates, or any of SLI's licensees."  *Id.*  This Court set a preliminary injunction hearing for February 14, 2011.

At the February 14 hearing, the Defendants introduced further evidence in support of their argument that Tomaskovich continued to operate the Westlake Learning Center after the License Agreement had been terminated and after she told the Defendants that she would cease all operations.  For example, on January 31, 2011, a Sylvan representative visited the Westlake Learning Center and observed that a "Sylvan" sign was still displayed in front of the Center.  Moreover, the representative entered the Center and observed "Sylvan marketing material[,] Sylvan on an entrance rug[,] [a]nd materials that Sylvan uses in their

---

[5]  For example, on January 19 and 20, 2011, a Sylvan employee saw students and teachers inside the Westlake Learning Center and also saw a lit "Sylvan" sign in front of the building.  *See* TRO Mot., Ex. 8, Krafchek Aff., ECF No. 36-9.  In addition, on January 26, 2011, a Sylvan employee telephoned the Westlake Learning Center and Tomaskovich answered "Westlake Learning Center." *See* TRO Mot., Ex. 9, Rollins Aff., ECF No. 36-10.

center instruction area." Feb. 14, 2011 Hr'g Tr. at 37, ECF No. 130-6. This Court then granted the Defendants' motion for preliminary injunction. *See* PI Order, ECF No. 63.

In sum, Plaintiffs have made no payments on the Promissory Notes as of June 2009. Moreover, between April 2010 and December 28, 2010, when the License Agreement was terminated, Plaintiffs failed to make any royalty or advertising payments in addition to the payments due under the Promissory Notes. Moreover, it is clear that the Plaintiffs continued to operate the Westlake Learning Center after the License Agreement had been terminated. In this regard, the Defendants argue that there are no disputed issues of material fact with respect to their Amended Counterclaims. They argue that "Plaintiffs irrefutably breached the License Agreement, the Asset Purchase Agreement, the Promissory Notes, and the Guarantee by failing to pay the amounts required to be paid by those documents and by continuing to reap all benefits of operating a Sylvan franchise." Defs.' Mot. Summ. J. at 12, ECF No. 71.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is

limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (U.S. 2009); *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).  If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted.  *Anderson*, 477 U.S. at 249-50.  On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md.  2001) (citations omitted).

**ANALYSIS**

## I.  THE CONTRACTS ARE VALID & ENFORCEABLE

As all of the Defendants' Amended Counterclaims arise out of the License Agreement, Asset Purchase Agreement, and Promissory Notes executed between the parties, the Plaintiffs have attacked the validity and enforceability of those contracts in opposing the Defendants' motion for summary judgment.  First, the Plaintiffs challenge the validity of the contracts on the ground that the contracts are void insofar as Defendant Sylvan Learning,

Inc.'s license to do business in the State of Ohio was revoked on February 6, 2007, and Plaintiffs argue that it therefore lacked the authority to enter into contracts or conduct business in Ohio.[6]  Second, the Plaintiffs argue that the contracts at issue, if not void, are unconscionable and therefore unenforceable.

Defendant SLI's license to do business in Ohio was indeed cancelled on February 6, 2007 by the Ohio Secretary of State.  *See* Ohio Cancellation Ltr., ECF No. 118-2.  Its license remained cancelled when it entered into the License Agreement contract with the Plaintiffs on July 26, 2007.  Ohio Revised Code Section 1703.03 requires that companies transacting business in Ohio hold a license to do so.  Specifically, the statute, in relevant part, states that: "No foreign corporation not excepted from sections 1703.01 to 1703.31 of the Revised Code, shall transact business in this state unless it holds an unexpired and uncanceled license to do so issued by the secretary of state."  OHIO REV. CODE ANN. § 1703.03.  Plaintiffs maintain that as a consequence of SLI's failure to maintain its license to do business in Ohio, it was prohibited from entering into contracts with the Plaintiffs.  However, Ohio Revised Code Section 1703.29 provides that:

> The failure of any corporation to obtain a license under sections 1703.01 to 1703.31, inclusive of the Revised Code, *does not affect the validity of any contract with such corporation*, but no foreign corporation which should have obtained such license shall maintain any action in any court until it has obtained such license.

---

[6]  While the Plaintiffs do make this argument in their opposition to the Defendants' motion for summary judgment, the bulk of the briefing on this issue is contained in their opposition to the Defendant's motion to dismiss the Plaintiffs' Complaint.  *See* Pls.' Supp. Reply at 10-11, ECF No. 118.  Similarly, the Defendants' reply to this argument is largely contained in their motion to dismiss and subsequent briefing on that issue.  *See* Defs.' Mot. to Dismiss at 28-29, ECF No. 114; Defs.' Reply at 16, ECF No. 125.

OHIO REV. CODE ANN. § 1703.29 (emphasis added).  As noted by the United States District Court for the Southern District of Ohio, "[w]hile an unlicensed foreign corporation *may enter into valid contracts*, it cannot maintain any court action until it obtains a license to transact business in the State of Ohio." *Auto Driveway Co. v. Auto Logistics of Columbus*, 188 F.R.D. 262, 264 (S.D. Ohio 1999).  Accordingly, SLI's failure to maintain its license with the State of Ohio did not affect its ability to enter into contracts in general, and specifically with respect to the License Agreement contract at issue in this case—the Plaintiffs' protestations to the contrary notwithstanding.[7]

With respect to the Plaintiffs' unconscionability argument, it is well established in Maryland[8] that "[a]n unconscionable contract involves extreme unfairness, made evident by

---

[7] It must also be noted that the Plaintiffs have brought their own breach of contract claims in their Amended Complaint based on the License Agreement and Asset Purchase Agreement.  *See* Pls.' Am. Compl. ¶¶ 129-146, ECF No. 103.  It is somewhat contradictory to argue on the one hand that the underlying contracts are invalid as a matter of law for purposes of opposing summary judgment, and on the other hand to argue that the contracts are valid and were actually breached by the Defendants.  *See Int'l Paper Co v. Schwabedissen Maschinen & Analagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) (The doctrine of equitable estoppel "precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity.") (citation and internal quotations omitted).

[8] In their briefing on other pending motions, the Plaintiffs have repeatedly maintained that Ohio law applies to a number of their claims.  *See, e.g.*, Pls.' Opp'n to Defs.' Mot. to Dismiss at 11, ECF No. 117.  In this regard, it appears as though Plaintiffs are arguing that this Court should apply Ohio law to their unconscionability argument made with respect to the Defendants' motion for summary judgment.  *See* Pls. Opp'n to Defs. Mot. Summ. J. at 11-13, ECF No. 123 (citing Ohio statutory and case law).  However, the License Agreement clearly states that "The parties agree that this agreement shall be interpreted and enforced according to the laws of the State of Maryland . . . ."  *See* License Agmt. ¶ 19, ECF No. 71-6.  Moreover, during the hearing conducted on February 14, 2011, Plaintiffs' second attorney, *see supra* note 4, agreed with this Court that the License Agreement is to be interpreted under Maryland Law.  *See* Feb. 14, 2011 Hr'g Tr. at 23, ECF No. 130-6.  Accordingly, this Court will interpret the Defendants' common law Amended Counterclaims under Maryland law.  That is not to say, however, that Maryland law will govern each and every common law issue in this case.  For example, in light of the fact that Maryland applies the *lex loci delicti* rule in tort cases, the Plaintiffs' tort claims asserted in the Amended Complaint may well be decided under Ohio law.  However, as this Memorandum Opinion only resolves the Defendants' motion for summary

(1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party." *Barrie Sch. v. Patch*, 933 A.2d 382, 394 (Md. 2007). Accordingly, "Maryland contract law on unconscionability contains two components, a procedural and substantive aspect." *Dieng v. College Park Hyundai*, No. DKC-09-0068, 2009 WL 2096076, at *5 (D. Md. July 9, 2009). The United States Court of Appeals for the Fourth Circuit has clarified the relationship between procedural and substantive unconscionability:

> Substantive unconscionability involves those one-sided terms of a contract from which a party seeks relief (for instance, "I have the right to cut off one of your child's fingers for each day you are in default"), while procedural unconscionability deals with the process of making a contract—"bargaining naughtiness" (for instance, "Just sign here; the small print on the back is only our standard form"). Each of these branches of unconscionability has common-law cousins; procedural unconscionability looks much like fraud or duress in contract formation, and substantive unconscionability reminds us of contracts or clauses contrary to public policy or illegal.

*Carlson v. General Motors Corp.*, 883 F.2d 287, 296 n.12 (4th Cir. 1989) (citation omitted). "The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." *Ratliff v. CoStar Realty Info., Inc.*, No. DKC-11-0813, 2011 WL 2680585, at *5 (D. Md. July 7, 2011) (quoting *Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547, 560 (Md. 2006)).

Here, it is clear that the contracts at issue do not involve "extreme unfairness" and are therefore not unconscionable. Plaintiffs were not forced to enter into contracts with the

judgment on their Amended Counterclaims, the issue is not before this Court and need not be decided in the context of this pending motion for summary judgment. Finally, it should be noted that with respect to Plaintiffs' unconscionability argument, Ohio law largely mirrors Maryland law on the subject. *Compare Rickard v. Teynor's Homes, Inc.*, 279 F. Supp. 2d 910, 915 (N.D. Ohio 2003) ("Unconscionability is generally recognized to include an absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party."), *with Barrie Sch. v. Patch*, 933 A.2d 382, 394 (Md. 2007) (discussed *infra*).

Defendants, and were not forced to purchase and operate a Sylvan Learning Center franchise.  Rather, the evidence strongly supports the Defendants' position that the parties negotiated extensively over a period of months before entering into the agreements.  This negotiation process is evidenced by the letter sent by Tomaskovich to the Defendants in which she specifically acknowledges the ways that the Westlake Learning Center was underperforming—indeed she highlights these flaws and concludes that "I am the most familiar with this Center and believe I can make a success of this Center as its franchise owner."  *See* Apr. 4 Helwig Ltr., ECF No. 71-4.  Accordingly, because this Court concludes that Plaintiffs have failed to show any procedural unconscionability under the first prong of the analysis, this Court need not reach the substantive unconscionability prong insofar as both elements must be present.  *See Ratliff*, 2011 WL 2680585, at *5.  In sum, the contracts at issue are valid and enforceable, and this Court will now proceed to analyze the Defendants' Amended Counterclaims.

## II.  DEFENDANTS' AMENDED COUNTERCLAIMS

The essential facts in this matter are uncontested.  The Plaintiffs entered into contracts with the Defendants to purchase and operate the Westlake Learning Center under the trademark of Sylvan Learning, Inc.  The Plaintiffs were unable to make payments on the Promissory Notes and stopped paying the amounts due.  The Defendants gave the Plaintiffs a substantial amount of time in which to cure their defaults, but also warned the Plaintiffs that if they did not pay the amounts due, the License Agreement would be terminated and the Plaintiffs would have to cease operating the Westlake Center and would have to cease using Sylvan's trademarks.  In April 2010, instead of making the required payments, the

Plaintiffs filed suit against the Defendants.  The Plaintiffs thereafter continued to operate the Westlake Center under the Sylvan moniker while making no payments or creating an escrow account for such payments.  On December 28, 2010, the Defendants terminated the License Agreement.  On January 13, 2011, Tomaskovich sent an e-mail to the Defendants in which she represented she would cease operating the Westlake Center that same day. Notwithstanding this representation, she continued to operate the Center at least until the February 2, 2011 hearing in this Court on the Defendants' motion for temporary restraining order.

The Plaintiffs do not, and indeed cannot, refute these facts.  Instead, much of the Plaintiffs' opposition to the Defendants' motion for summary judgment on their Amended Counterclaims attacks the Defendants' claims on what could be termed affirmative defense grounds.  Specifically, the Plaintiffs argue that (1) the Defendants committed fraud in connection with the sale of the Westlake Center; (2) the Defendants breached the terms of the License Agreement first by allowing competing franchises to operate in the Westlake Center's exclusive territory; and (3) that the Defendants violated the Maryland Franchise Registration and Disclosure Law by offering an unregistered franchise for sale.  *See* Pls.' Opp'n at 13-22, ECF No. 73.  These arguments are without merit and do not defeat the entitlement of the Defendants to summary judgment on amounts due and owing under the

amended Promissory Notes.[9]

The Plaintiffs' first two arguments are related and fail for the same reason.  The Plaintiffs claim that the defendants were the first party to breach the terms of the license agreement by (1) failing to provide documents regarding the financial condition and operations of the Westlake Center, and (2) allowing competing Sylvan franchises to operate inside the exclusive territory of the Westlake Center.  However, this "you breached first" defense has been previously rejected by this Court.  A franchisee cannot simply respond to a franchisor's alleged initial breach by breaching the agreement herself and continuing to operate the franchise without the payment of any fees.  In a case construing this precise issue, this Court rejected such an affirmative defense:

---

[9]  In their Amended Counterclaims, the Defendants do not specify the damages sought.  Generally, the Defendants allege that as a result of the Plaintiffs' breaches and default, they currently owe an accelerated payment to Sylvan Learning, Inc. in the amount of $16,923.76 plus $17,069.56 in royalty fees, and an accelerated payment to Sylvan Learning Centers, LLC in the amount of $153,974.74, plus "at least" $62,352.02 in accrued interest and $5,971.28 in marketing fees.  *See* Defs.' Am. Countercls ¶ 41.  In Count I, Defendants request "permanent injunctive relief preventing Plaintiffs' infringement of the SLI Marks," as well as damages that are "not capable of ascertainment at this time."  *Id.* ¶¶ 62-63.  In Count II, Defendants request "permanent injunctive relief preventing Plaintiffs' unfair competition," as well as damages "caused by Plaintiffs' unfair competition."  *Id.* ¶¶ 74-75.  In Count III, Defendants request "permanent injunctive relief enforcing the non-compete provisions of the License Agreement," as well as damages "in an amount to be proven at trial."  *Id.* ¶¶ 87-88.  In Count IV, Defendants only allege that as a result of the Plaintiffs' breaches and default, the Defendants "have been damaged."  *Id.* ¶ 93.  In light of the fact that Defendants are entitled to summary judgment on Counts I through IV of their Amended Counterclaims, and because the Defendants have failed to provide a specific amount requested, further briefing and perhaps a hearing will be necessary to ascertain the precise summary judgment award.  Finally, because the Plaintiffs have ceased operating the Westlake Learning Center, it appears as though the Defendants requests for injunctive relief are largely moot.  However, to the extent those requests are not moot, the issue of permanent injunctive relief may also require further briefing and perhaps a hearing.

> Had 7–Eleven breached the agreement before McEvoy breached, he could
> have: 1) treated 7–Eleven's breach, if material, as a repudiation of the
> agreement and discontinued his performance and acceptance of benefits
> under the agreement; or 2) treated the breach as a partial breach and sued for
> damages.   [Citation omitted]   McEvoy could not respond to 7–Eleven's
> breach by reaping the agreement's benefits while discontinuing his
> performance under the agreement. *Id.* Accordingly, McEvoy cannot assert 7–
> Eleven's alleged breaches of the agreement as an affirmative defense to his
> breaches of the agreement.

*7-Eleven, Inc. v. McEvoy*, 300 F. Supp. 2d 352, 358 (D. Md. 2004).[10]

Therefore, even assuming *arguendo* that the Defendants in this case did materially

breach the License Agreement by either fraudulently withholding financial and operational

materials or by allowing territorial infringement, the Plaintiffs were nevertheless prohibited

from taking the action they did—namely, "respond to [the Defendants'] breach by reaping

the agreement's benefits while discontinuing [their] performance under the agreement." *Id.*

Instead, Plaintiffs could have "1) treated [the Defendants'] breach, if material, as a

repudiation of the agreement and discontinued [their] performance and acceptance of

benefits under the agreement; or 2) treated the breach as a partial breach and sued for

damages." *Id.*

The Plaintiffs' final defense, that the Defendants violated the Maryland Franchise

Registration and Disclosure Law ("MFRDL"), MD. CODE ANN., BUS. REG. § 14-201, *et seq.*,

by not registering the Sylvan franchise prior to offering it to the Plaintiffs, is also without

---

[10]   Ironically, in their brief in opposition to the Defendants' motion to dismiss, the Plaintiffs
specifically acknowledge that they are precluded from asserting this defense against the Defendant'
Amended Counterclaim for breach of contract.  *See* Pls.' Opp'n at 5, ECF No. 117 ("[*7-*]*Eleven, Inc.*
simply precludes OLC and Tomaskovich from using the defense against Defendants' Counterclaim
for breach of contract.").

merit.  The MFRDL requires that "a person must register the offer of a franchise with the Commissioner before the person offers to sell, through advertisement or otherwise, or sells the franchise in the State." *Id.* § 14-214.  However, pursuant to the Code of Maryland Regulations, entities offering the sale of franchises outside of the State of Maryland are not subject to the registration requirements: "The registration provisions of the Maryland Franchise Law *do not apply* to an offer or sale of a franchise to a resident of a foreign state, territory, or country who is not a resident of Maryland to the knowledge of the seller."  MD. CODE REGS. 02.02.08.10b (emphasis added).  Here, it is undisputed that Plaintiffs are not residents of the State of Maryland, and therefore cannot seek solace in the MFRDL.

This Court will now turn to the Defendants' substantive claims.

### A. COUNTS I & II—LANHAM ACT

In Counts I and II of their Counterclaim, Defendants move for summary judgment under the Lanham Act, 15 U.S.C. §§ 1114 & 1125, claiming trademark infringement and unfair competition.  To establish trademark infringement under the Lanham Act, a complainant must prove "(1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred 'in commerce'; (4) that the defendant used the mark 'in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers." *People for Ethical Treatment of Animals v. Doughney*, 263, F.3d 359, 364 (4th Cir. 2001) (quoting 15 U.S.C. §§ 1114, 1125(a)); *see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir. 1995).  With respect to the unfair competition claim asserted in Count II, the Fourth Circuit has noted that it "is well established that the

test for unfair competition claims under section 43(a) of the Lanham Act is whether there is a likelihood of confusion." *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 597 (4th Cir. 1992) (citing *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984)).

Here, the Defendants have met each element and are therefore entitled to summary judgment on Counts I and II of their Amended Counterclaims. The Plaintiffs have not challenged the validity of the Defendants trademarks.[11] After the License Agreement was terminated on December 28, 2010, the Plaintiffs clearly continued to operate the Westlake Learning Center under the Sylvan name and with "Sylvan" trademarked materials. The Plaintiffs' use of the marks was unquestionably "in commerce" and "in connection with the sale, offering for sale, distribution, or advertising of goods or services." While the Plaintiffs argue that "[t]here is simply no evidence that OLC or Tomaskovich was competing with Sylvan to sell the same goods or services," Pls.' Opp'n at 5, ECF No. 123, they were in fact operating a *Sylvan* learning center and selling *Sylvan* services after the License Agreement had been terminated. Finally, it is clear that the use of the Defendants' marks by the Plaintiffs was in a manner "likely to confuse consumers." As the Fourth Circuit has explained, "[t]he ultimate question, for purposes of determining liability in trademark infringement actions, is whether there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the source of the goods in question." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990) (citations and internal quotation marks omitted). Here, after the License Agreement had been terminated,

---

[11] Defendant Sylvan Learning, Inc. holds the following federally registered trademarks: Registration Nos. 2,929,120; 3,584,877; 1,410,891; 3,732,803; 3,735,313; 3,726,693; 3,628,814; 3,726,694; 1,330,154; 2,944,188; 2,880,180; 3,014,643; and 3,014,644.

the Plaintiffs were not authorized to operate a Sylvan Learning Center—yet that is precisely what they did.  The purchasers of the Westlake Learning Center's services undoubtedly thought they were purchasing *Sylvan* services, particularly in light of the large *Sylvan* sign in front of the Westlake Center, the *Sylvan* rug in the lobby of the building, and the *Sylvan* brochures and materials displayed in the Center.  In this regard, there was clearly a likelihood of confusion in the minds of consumers, and the Defendants are entitled to summary judgment on Counts I and II of their Amended Counterclaims.

### B.  COUNT III—BREACH OF COVENANT NOT TO COMPETE

Under Maryland law, covenants not to compete may be enforced "only against those employees who provide unique services, or to prevent the future misuse of trade secrets, routes or lists of clients, or solicitation of customers."  *Becker v. Bailey*, 299 A.2d 835, 838 (Md. 1973).  In determining whether a restrictive covenant in an employment contract is enforceable, courts assess "whether the particular restraint is reasonable on the specific facts."  *Ruhl v. F.A. Bartlett Tree Expert Co.*, 225 A.2d 288, 291 (Md. 1967).  Such covenants will be enforced "if the restraint is confined within limits which are no wider as to area and duration than are reasonable for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public."  *Id.* (internal quotations omitted); *see also Deutsche Post Global Mail, Ltd. v. Conrad*, 292 F. Supp. 2d 748, 754 n.3 (D. Md. 2003) ("under Maryland law restraints in restrictive covenants must be viewed in the context of the hardship imposed on the employees and the necessity of the restraint to protect the employer's interests").  When the scope of a restrictive covenant is

considered to be reasonable on its face, courts may, in determining enforceability, assess

other facts and circumstances, such as:

> whether the person sought to be enjoined is an unskilled worker whose services are not unique; whether the covenant is necessary to prevent the solicitation of customers or the use of trade secrets, assigned routes, or private customer lists; whether there is any exploitation of personal contacts between the employee and customer; and, whether enforcement of the clause would impose an undue hardship on the employee or disregard the interests of the public.

*Budget Rent A Car of Wash., Inc. v. Raab*, 302 A.2d 11, 13 (Md. 1973).

Pursuant to the License Agreement, the Plaintiffs agreed to the following post-

termination non-compete provisions:

> In the event this Agreement is terminated, expires, or is not renewed, or if Licensee assigns or transfers its interest herein to any person or business organization, then in such event Licensee covenants, *for a period of two (2) years* after such termination, expiration, nonrenewal, transfer or assignment not to engage as an owner, operator, or in any managerial capacity. In any educational business offering individualized diagnostic tests or academic or prescriptive educational programs which are designed to be personally taught, supervised or administered by trained instructors, or in any educational business offering programs or services competitive with programs or services available at Sylvan Learning Center during the term of this Agreement and at the time of termination or expiration of this Agreement, and which programs or services Licensee offered at its Center during the two (2) year period prior to the termination or expiration of this Agreement, within the Territory or at any location *less than five (5) miles* from the Territory boundary, other than as an authorized licensee of another Sylvan Center. It is understood and agreed that the purpose of this covenant is not to deprive Licensee of a means of livelihood end will not do so, but is rather to protect the goodwill and interest of Sylvan and the Sylvan System.

License Agmt. ¶ 11.5.2, ECF No. 71-6 (emphasis added).

Regarding the scope of the non-compete, the License Agreement prohibits the

Plaintiffs, for a period of two years, from operating an educational business offering services

similar to those typically provided by the Defendants within a five mile radius of the Westlake Learning Center's territorial boundary.   The two year limitation is reasonably circumscribed.   Courts applying Maryland law have repeatedly upheld competition restrictions that cover two years. *See PADCO Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606 (D. Md. 2002); *Gill v. Computer Equipment Corp.*, 292 A.2d 54 (Md. 1972); *Tuttle v. Riggs-Warfield-Roloson*, 246 A.2d 588 (Md. 1968).   Moreover, the five mile limitation is also reasonable.   This Court has previously upheld non-compete agreements imposing far broader, or even unlimited geographic limitations. *See, e.g., TEKsystems, Inc. v. Bolton*, No. RDB-08-3099, 2010 WL 447782, at *5 (D. Md. Feb. 4, 2010) (fifty miles); *Merry Maids Ltd. P'ship v. Kamara*, 33 F. Supp. 2d 443, 446 (D. Md. 1998) (seventy-five miles); *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 641 (D. Md. 1998) (no geographic limitation).

In sum, the covenant not to compete at issue in this litigation is sufficiently limited and is therefore reasonable.   More to the point, the Plaintiffs do not even argue that the covenant at issue is not reasonable.   Instead, the Plaintiffs argue that they "engaged in no commercial transactions after learning of the termination of the License Agreement," Pls.' Opp'n at 7, and therefore did not violate the non-compete clause of the License Agreement. As discussed above, the Plaintiffs *did* engage in commercial transactions by operating the Westlake Learning Center after the License Agreement had been terminated on December 28, 2010, and even after Tomaskovich specifically stated that she would cease operations on January 13, 2011.   For those reasons, it is clear that the Plaintiffs violated the non-compete clause in the License Agreement by operating the Westlake Learning Center, and the

Defendants are entitled to summary judgment on Count III of their Amended Counterclaims.

### C. COUNT IV—BREACH OF CONTRACT

To establish a cause of action for breach of contract in Maryland, a complainant must allege that a contractual obligation exists and that the defendant has breached that obligation. *See Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001); *Continental Masonry Co. v. Verdel Constr. Co.*, 369 A.2d 566, 569 (Md. 1977).   As previously discussed, the contracts between the parties in this case are valid and enforceable, and the Plaintiffs unquestioningly failed to make payments as required under those contracts.   Moreover, to the extent the Plaintiffs did make some "token" payments on the Promissory Notes, *see supra* note 3, a reduced payment plan was never presented to the Defendants for consideration.   Finally, to the extent that the Plaintiffs argue that their breach was a consequence of the Defendants' prior breach, this Court has already concluded that the Plaintiffs are precluded from asserting that affirmative defense.   *See 7-Eleven, Inc. v. McEvoy*, 300 F. Supp. 2d 352, 358 (D. Md. 2004); *see also* Pls.' Opp'n at 5, ECF No. 117 (acknowledging that *7-Eleven v. McEvoy* "precludes OLC and Tomaskovich from using the defense against Defendants' Counterclaim for breach of contract."). Accordingly, it is clear that the Plaintiffs breached their contractual obligations by failing to make required payments and the Defendants are entitled to summary judgment on Count IV of their Amended Counterclaims.

### D.  COUNT V—ATTORNEYS' FEES & COSTS

In Count V of their Amended Counterclaims, the Defendants seek reimbursement of all attorney's fees incurred in this action pursuant to a fee-shifting provision in the License Agreement.  Specifically, Paragraph 16 of the License Agreement states:

> [I]n the event either [SLI] or [OLC] institutes a suit or action to enforce any term or provision of [the License] Agreement, *the most prevailing party* in the suit or action, or on appeal, shall be entitled to recover from the losing party a *reasonable* attorney fee to be set by the trial or appellate court in addition to costs or disbursements provided by law.

License Agmt. ¶ 16 (emphasis added).

Notwithstanding the fact that the Defendants are entitled to summary judgment on Counts I through IV of their Amended Counterclaims, at this stage in the litigation it is not yet clear that the Defendants will be "the most prevailing party" in this case.  This Court has not yet ruled on the Defendants' motion to dismiss the Plaintiffs' Amended Complaint.  Plaintiffs' may yet be successful on at least some of those claims, and it is therefore premature to grant the Defendants' request for attorney's fees.

Moreover, the fee-shifting provision in the License Agreement only provides for an award of "reasonable" fees to be determined by the Court.   In calculating an award of attorney's fees, this Court typically conducts a lodestar analysis, which is defined as a "reasonable hourly rate multiplied by hours reasonably expended."  *Grissom v. The Mills Corp.*, 549 F.3d 313, 320-21 (4th Cir. 2008).   Because the Defendants have not submitted any documentation regarding their hourly rate or hours expended, this Court cannot conduct the requisite analysis.  *See Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990) (stating that "[i]n addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific

evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award") (internal citation omitted).

CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment on their Amended Counterclaims (ECF No. 71) is GRANTED IN PART and DENIED IN PART.  The motion is granted with respect to Counts I through IV and denied with respect to Count V.

A separate Order follows.

Dated:        March 27, 2012

                                                             /s/_____
                                                             Richard D. Bennett
                                                             United States District Judge